IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

Wade Steven Gardner,
Mary Joyce Stevens,
Randy Whittaker Individually
and his Official Capacity at
Southern War Cry,

Veterans Monuments of America, Inc.,
Andy Strickland, US Army Ret, President

Capt. Phil Walters, In his Official
Capacity as 1st Lt. Commander of the
Judah P. Benjamin Camp #2210
Sons of Confederate Veterans,

Ken Daniel, In his Official
Capacity as Director of Save
Southern Heritage, Inc. Florida

Plaintiffs

v.                                                          Civil Action No. 8:18-CV-02843
William Mutz
In his Official Capacity as
Mayor of the City of
Lakeland, Florida

Tony Delgado
In his Official Capacity as
Administrator of the City of Lakeland, Florida

Don Selvege, Individually and
In His Official Capacity as
City of Lakeland, Florida Commissioner

Justin Troller, Individually and
In His Official Capacity as
City of Lakeland, Florida Commissioner

Phillip Walker, Individually and
In His Official Capacity as
City of Lakeland, Florida Commissioner

Antonio Padilla
In his Official
Capacity as President of
Energy Services & Products Corp.

Kenneth Detzner In his Official
Capacity as Secretary of State of
the State of Florida

---

## PLAINTIFFS' COMPLAINT
## & APPLICATION FOR INJUNCTIVE RELIEF

---

### PARTIES

1. Plaintiff, Steve Gardner is a citizen taxpayer of Lakeland, Polk County, Florida.

2. Plaintiff, Randy Whittaker is a citizen taxpayer of Polk County, Florida with Confederate Dead in his family lineage.

3. Southern War Cry is an organization with over 100,000 members administered by Randy Whittaker.

4. Plaintiff, Judah P. Benjamin Camp #2201  Sons of Confederate Veterans is a

subdivision of Florida Division Sons of Confederate Veterans, Inc. A Florida non-profit

corporation whose purpose is to 'vindicate the cause' for which the Confederate Veteran

fought.  They are the successor organization of the United Confederate Veterans, the

membership organization for the soldiers and sailors who served for the Southern

Confederacy during the War of 1861-1865.

5. Plaintiff, Veterans Monuments of America, Inc. is a non-profit corporation that is organized under the laws of the State of Florida whose purpose is to protect and preserve Memorials to American veterans.

6. Plaintiff, Mary Joyce Stevens is an individual who resides in the State of Georgia and whose Grandmother was President of the Annie H. Darracott Chapter 791, United Daughters of the Confederacy and herself was a member of the Dixie Lee Chapter of the Children of the Confederacy, an auxiliary of the Annie H. Darracott Chapter 791, United Daughters of the Confederacy, and who has Confederate Dead in her family lineage. She is currently a member of Atlanta Chapter 18, and past president of the James Dunwoody Bulloch Chapters of the United Daughters of the Confederacy.

7. Plaintiff, Save Southern Heritage, Inc. is South Carolina non-profit corporation whose purpose is to preserve the history of the south for future generations. The Florida Branch purpose is to fulfill the organization's purpose throughout the State of Florida. This Plaintiff has a particular interest in the Lakeland Cenotaph as the 1910 Cenotaph represents post-war Florida history during the turn of the century land rush to a newly-formed City, whose city center would become a landmark and welcoming beacon to migrants seeking economic prosperity after decades of post-war economic depression.

8. Defendant, William Mutz, is Mayor of the City of Lakeland and is being sued in his official capacity, as well as individually.

9. Defendant, Don Selvege, is being sued in his official capacity as City of Lakeland Commissioner, as well as individually.

10. Defendant, Justin Troller is being sued in his official capacity as City of Lakeland Commissioner, as well as individually.

11. Defendant, Phillip Walker is being sued in his official capacity as City of Lakeland Commissioner as well as individually.

12. Defendant, Jim Malless is being sued individually.

13. Defendant, Tony Delgado is being sued individually as well as in his official capacity as City Administrator for the City of Lakeland.

14. Defendant, Antonio A. Padilla, is being sued individually, as well as in his official capacity as President of Energy Services & Products Corp a Florida for profit corporation.

15. Defendant, Kenneth Detzner, is Secretary of the State of Florida and is being sued in his official capacity.

## JURISDICTION

16. The Court has jurisdiction over this lawsuit, because this action arises under the Constitution, laws, or treaties of the United States.  28 U.S.C. § 1331.  Pursuant to the First and Fourteenth Amendments to the U.S. Constitution "Congress shall make no law . . . abridging the freedom of speech" . . . "[n]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny any person within its jurisdiction the equal protection of the laws."  This Court has jurisdiction over the state law claims asserted herein under the doctrine of pendent jurisdiction.

## VENUE

17. Venue is proper in the Middle District under 28 U.S.C. § 1931(B)(2), because all of the events or omissions giving rise to this claim occurred in the Middle District and because all of the property at issue is situated in the Middle District.  Munn Park and the Munn

Park Cenotaph  ("Cenotaph") are located in the Middle District, and the defendants' illegal and unconstitutional actions occurred in the Middle District when they ordered the unlawful and unconstitutional removal of the Munn Park Cenotaph.

## FACTS

18. In 1882,  Abraham Munn, a resident of Louisville, Kentucky,  purchased 80 acres of land in what is now downtown Lakeland.  In 1883, railroad service was established.

19. In 1884, Mr. Munn platted the acreage and included a traditional "Public Square" in Lakeland's first subdivision, the original Munn's Subdivision. The entire block was dedicated by Abraham Munn as a "Public Square" and outdoor meeting place and center for public debate and discourse into perpetuity, to forever remain in public ownership and would become known as "Munn Park". The City of Lakeland was incorporated January 1, 1885, with Park Trammel, a local attorney, the first Mayor.

20. In 1885, Mr. Munn built the Tremont Hotel, said to have been the best hotel in Central Florida at that time.

21. Munn Park was developed as a focal point as the town's center for public use, including walks, bandstand and a well and served as a backdrop to Lakeland's first train station located at the park's northern border.

22. Veterans of the war of 1861-1865 and their families flooded into the City from states which were former members of the Confederate States of America ("CSA") and The United States of America during the war.  They established farms and businesses, and helped the city grow and prosper.  The population exploded ,doubling each decade from 502 in 1890, to 1180 in 1900, and to 3719 in 1910.

23. In 1902 and 1903, a dry goods store, a furniture store, and  a theatre were established on the periphery of the Park.   Some 25 trains were stopping in Lakeland each day. Because of the excellent railroad service, progressive outlook, attractive location and elevation (227 feet), the community grew and prospered.

24. Before 1905, the United Confederate Veterans would charter Lakeland Camp 1543.  The United Confederate Veterans was the fraternal membership organization of the veterans of the War from the Confederate States of America.  James Abner Cox and Robert Otho Cresap were Commander and Adjutant, respectively, of the Camp.   Mr. Cox was approved for a Confederate Veteran's pension from the State of Florida.  His application states that he moved to Polk County on July 10, 1889, and he had served in a Mississippi unit.  The Polk County Commission approved his application on August 5, 1907, and forwarded it to the State of Florida Pension Department, who approved it on August 8, 1907. He was approved to receive $120 per annum. Mr. Cox' application stated he was combat wounded in the thigh at Fredricksburg.  He resided in Kathleen at the time of his application. Burial records indicate that he died on 15 May 1923, aged 85, and is interred at Lakeview Cemetery in Lakeland, Polk County, Florida.  A photograph of James Abner Cox shows him wearing the UDC's Southern Cross of Honor, which was bestowed by the UDC on the Southern veterans in absentia its official government.

 Mr. Cresap was also approved for a Florida Confederate Veteran Pension.   His application states that he was born in Kentucky and served in a Kentucky Cavalry unit and moved to Polk County in April 1887.  He resided in Lakeland when his $100 per annum Pension was approved on December 28, 1907.  Burial records indicate that he

died on 11 January 1941, aged 97, and is interred in Lakeview Cemetery in Lakeland, Polk County, Florida.

25. On June 3, 1908, the City Minutes record that a petition by the UDC to erect a monument in Munn Park was approved. All donors, and the petitioning Chapter (Annie H. Darracott #791) as well as the city fathers had the expectation of permanency for such a large and expensive undertaking.

26. For many years prior to and after the approval, the UDC raised funds for the Cenotaph, by holding and approving tag day sales, bazaars, bake sales, ice cream socials, and lemonade stands. The City united behind the effort as baseball game proceeds, shows and plays proceeds, and donations from merchants, residents, and the City itself, were added to the funds the ladies raised for the Cenotaph.

27. During the Cenotaph's fundraising period, three more structures were erected surrounding Munn Park, including a residence (1905), telephone and telegraph office (1907) and another hotel (1908).

28. With the Donations, the Munn Park Cenotaph was designed, ordered, purchased and erected by the Annie H. Darracott Chapter 791 United Daughters of the Confederacy as directed by the City in the center of Munn Park.

29. The massive 26' foot 2 ½ story, approximately 14 ton Cenotaph, with base dimensions of 9' by 9' was dedicated on June 3 1910, only 15 years and 6 mos. after the founding of the City.

30. The Cenotaph was dedicated on June 3, 1910. The dedication address was delivered by a prominent Lakeland figure, former City Mayor Park Trammel (1899-1903) who had gone on to serve as the 21st Governor of Florida (1904-1908) and was serving as U. S. senator

(1909-1913) at the time of the Dedication.  The ceremony was attended by then Lakeland Mayor W. K. Jackson and contemporaneous news reports described it as *'probably the largest crowd in her [Lakeland's] history'.*

31. At the time of the decision by the City Commission, as well as at the time of the erection of the Cenotaph, women in the State of Florida could not vote, and the 19th Amendment to the U.S. Constitution had not been ratified.   The UDC members were suffering dis-enfranchisement from the political process in America.   Nonetheless, they achieved political speech alternatively, through erecting Memorials to their lost husbands, fathers, brothers, husbands, uncles, and grandfathers.   According to the history of the UDC, through erecting Memorials, *"the women of the South have tried to make marble and bronze tell in chiseled words the glory of the men who wore the gray".*  These veterans had been called upon by their communities, states, and country to defend their homeland. The Confederate veterans memorialized by the Cenotaph are all now dead.

32. Senator Trammell's address *"paid considerable homage to the service of southern women on the home front during the war and to the preservation of this spirit by the UDC,"* despite their lack of political status.  The monument, he stated, was evidence that *'the patriotic love and devotion of the women of the South of those days has been transplanted into the minds and hearts of the present generation".*

33. In 2000, Senator Park Trammel was recognized by the State of Florida by his induction into the "Great Floridians" program and Senator Trammell is still considered a hometown hero in Lakeland today, and his home was named by the City to be a "Landmark".

*34.* The ladies of the UDC inscribed the Cenotaph  not only with the organizing group's name, but also the *words "Confederate Dead"* in bas-relief on the pedestal base facade. Higher on a second stage, the Cenotaph is adorned with bas-relief crossed Confederate Battle flags on staffs, Army of Northern Virginia version, with the numerals *"1861"* above and *"1865"* below  the flags, signifying the years of the armed conflict honored by the Cenotaph and by the people of Lakeland.   *"CSA"* is engraved on the shaft above the base signifying the Confederate States of America, for whom the Cenotaph's Dead memorializes.  On the opposite base façade, a poem in bas-relief reads *"In memory of that noble band, who have crossed the mystic stream, and are resting now in that happy land, where peace and pleasure reign supreme.   The heroic deeds will never fade, from memory's brightest page, and their brave defense of country and home, is left as a glorious heritage."*

35. At the Dedication Ceremony, it was reported that the UDC 'presented' the Monument to 'The Veterans."

36. For many, many years to come, the City would continue to develop around Munn Park and its Cenotaph. Free mail delivery was inaugurated in 1912, and in 1915 the cornerstone of the first hospital was laid. The Florida land boom of the 1920's resulted in the construction of many significant structures around Munn Park, a number of which are today listed on the National Register of Historic Places and the collection today comprises a National Register Historic District. This list includes the Terrace Hotel, New Florida Hotel (Lake Mirror Tower Apartments), Polk Theatre, Park Trammell Building (formerly the Lakeland Public Library and today home to the Lakeland Chamber of Commerce), and others, which post-date the Cenotaph.  Munn Park and the Cenotaph

were a focal point of, and magnet for, the growth and prosperity that resulted in Lakeland's "Golden Age." The town was so attractive that the Cleveland Indian baseball team held spring training in the City from 1923 to 1927.

37. In 1912, Lakeland Camp 1543, United Confederate Veterans ("UCV") appeared in the "Organization of Camps" of the UCV Convention. In 1906, in convention, the UCV passed a Resolution authorizing the Sons of Confederate Veterans, Inc. to be its successor organization.

38. Decade after decade, the Monument in Munn Park was a prominent feature of the City's landscape, and was featured on tourist literature and picture post cards of Lakeland.

39. In anticipation of the 100th year anniversary of the incorporation of Lakeland, the City embarked on a program of historic preservation, passing several ordinances over a span of multiple decades:

   a. On 4 February 1980 the City of Lakeland adopted Ordinance **2175** that established Historic Preservation Board to oversee the City's historic preservation initiative. It was signed into law by Mayor Carrie Oldham.

   b. On 7 July 1980, the City adopted Ordinance **2203** ("Protection Ordinance") for the specific purpose of establishing a *"...historic preservation program...for the preservation of buildings, structures and sites of historic significance to the City...and to discourage the demolition of sound structures."* The Ordinance stated that *"No building, structure, or site of any kind shall be erected, altered, constructed, restored, moved or demolished within the district until an application for a Certificate of Review ...has been approved by the Committee"*. *"Structure"* was defined as *"any improvement to a site which is placed or constructed by man*

*regardless of size, material(s) purpose or design*."  "Site" was defined to mean *"a piece of ground whether improved or unimproved under single or multiple ownership by any public or private corporation, association, trust or individual, or any combination thereof.*  It was signed into law by Mayor Carrie Oldham. Ms. Oldham, an educator, has the distinction of being Lakeland's first African-American Mayor.

c.  <u>On July 7, 1980</u>, the City also passed Ordinance **2204** created the Munn Park Historic District ("District") with the stated purpose of *the "perpetuation of historic structures and landmarks"* within the Munn Park District.  Again, Ms. Oldham, signed the Ordinance into law.

d.  On <u>January 3, 1983</u>, the City amended the Protection Ordinance through passage of Ordinance **2428**, adopting guidelines for reviewing applications for certificates for review.  This was signed into law by Mayor Frank J. Reilly.

e.  Two years later, on <u>February 7, 1983</u>, the City passed Ordinance **2440** that slightly altered the boundaries of the Munn Park Historic District.  This amendment was at the recommendation of Paul L. Weaver, III, Historic Sites Specialist for the State of Florida Department of State.  Mr. Weaver's recommendation includes the observation that *"the high level of architectural integrity retained by the majority of the building in the district is unusual for an urban commercial area in Florida"* and consequently *"because of the district itself"* he would recommend certifying the District if the boundary amendment was made.  The requested amendment recommended the inclusion of the site of the All Saint's Episcopal Church and Lakeland City Hall at 202 South, and 228

Massachusetts Ave. respectively, on the basis that "*their inclusion provides a clearer sense of the past and present character of the Munn Park District. The Munn Park District was, and remains, not only a commercial center, but a religious, civic, and governmental center as well.*"

f.  14 years later, on <u>September 15, 1997</u>, the City passed **Ordinance 3841** that ratified the Protection Ordinance but renumbered and added members to the Historic Preservation Board. The Ordinance was signed into law by Mayor Ralph L. Fletcher.

g.  In the year of the 112th anniversary of the establishment of Lakeland, in <u>September 1997</u>, the City of Lakeland nominated the Munn Park Historic District, consisting of 53 contributing resources including:

    i.  50 contributing buildings,

    ii.  2 contributing site (one being Munn Park),

    iii.  1 contributing object (the Cenotaph) and

      28 non-contributing resources for National Register of Historic Places Registration.

h.  The Nomination was Certified by the State of Florida the same month and awarded National Historic Register Designation in November by the U.S. National Park Service.  The contributing resources include Munn Park, the Cenotaph and the buildings that were constructed and remained from Lakeland's earliest years, therein designating the Park and its Cenotaph to be of Historic significance to Lakeland, the State of Florida and the United States of America. As a result of the approval of the Nomination, all the historic resources, including

the Cenotaph were added to the Florida Master File of Historic sites under their purview and statutory protection.

      i.   15 years later, on <u>December 16, 2013</u>, The Protection Ordinance was re-affirmed when it was incorporated into Article 11 of the City of Lakeland Land Development Code which was adopted by **Ordinance No. 5455**. The ordinance was signed into law by Mayor R. Howard Wiggs.

40. The City of Lakeland installed and maintains a Historic Marker on the base of the Park's entry arch that discusses the significance of Historic Munn Park and the Historic Cenotaph to wit "Munn Park was established in 1884 as a town square in Lakeland's first subdivision, the original Munn's Subdivision. Later the entire block was dedicated by Abraham Munn as a "Public Square" in perpetuity, to forever remain in public ownership. As early as 1889 the site was developed for public use, including walks, bandstand and a well. About this time it was briefly known as Drane Park and served as a backdrop to Lakeland's first train station located at the park's northern border. Early in the 20th century the park served as an outdoor meeting place and center of public debate. Over the years the park has undergone several changes. In 1910 a Confederate monument was placed in the center of a circular walkway to honor those who died in the Civil War. Later ponds and gardens were added. In 1961, angular pattern walkways replaced the circle. A gazebo and the lighted, musical "waltzing waters" fountain were added features. In 1989 the park was redesigned to enhance the character of the surrounding Munn Park Historic District. The redesign has taken the park back to the more simplistic "Town Square Era" in which the district was originally developed.

The City of Lakeland proudly rededicates this park to the residents of Lakeland and recognizes the contribution of the Lakeland Area Chamber of Commerce Visual Improvement."

41. In various volumes on the history of Lakeland, the significance of Historic Munn Park and the Historic Cenotaph are referenced.

42. Along various State and Federal highways including Interstate Highway 4, the Munn Park Historic District is identified with brown Historic District signage.

43. Historic Munn Park and the Historic District are prominently featured in a document publicized by the Lakeland Downtown Development Authority entitled *"A Waking Tour of Lakeland"* that is currently used to promote historical tourism in Lakeland.

44. The Historic Cenotaph in Munn Park is featured as the only Historic resource in the City of Lakeland in the "Florida Civil War Heritage Trail" historical tourism guidebook Published by the Florida Department of State, Division of Historical Resources. ISBN #1-889030-22-7.

45. Through the establishment and continual reaffirmation of the Ordinances, Historic Nominations with the National Register, and State of Florida Certification, for decades, the City of Lakeland had a clear policy of protecting its unique cultural and historic Munn Park District. No City, State, nor National de-commissioning or de-certification of the historical Cenotaph has occurred.

46. Due to complaints by a small number of city residents, fueled by the National Association of Colored People "NAACP", an outside group, presuming without justification to speak for all African-Americans, despite the fact that the Protection Ordinance was signed into law by an African-American woman, and which has made a

practice of demanding removal of Confederate-themed imagery, and on December 4, 2017,  at a meeting of the Lakeland City Council, the City Commission voted to "start the process" of taking down the Cenotaph, despite its status as a 'Contributing Object" in the Historic District, and being the only Object in the District.  Commissioners voting to remove the Cenotaph were:  Justin Troller, Don Selvage, Phillip Walker and Jim Malless, who are named as defendants.  This vote is a violation of the City's own Historic Preservation Ordinance.

47. In early 2018, through its City manager, Tony Delgado, who is named in his official capacity as a defendant, obtained a proposal from a contractor to remove the Historic Cenotaph from its perpetual site in Munn Park in the Munn Park Historic District.

48. At a public Agenda Study Meeting on April 14, 2018, Mayor Bill Mutz, a defendant both individually and in his official capacity, stated that the Cenotaph **would be moved**.  He did not mention the Protection Ordinance, national Historic Registry, nor the State Historic Registry, nor how they were to be overcome these protections.

49. On May 7, 2018 the Lakeland City Commission voted to relocate the Cenotaph from Historic Munn Park to another site out of the historic district, "provided private donations paid for the full costs".  The City of Lakeland through Mayor Mutz and through Don Selvege, personally, began soliciting Private Donations including establishing a 'Go Fund Me' page.  Mayor Mutz reportedly used City Taxpayer funds to pay for the postage for a fundraising letter that was sent to a 'list'.  Despite these efforts, only a fraction of the necessary Private Donations have materialized.  As of October 10, 2018 at 4:48 p.m. only $26,209 of the $225,000 goal (11.65%) had been reached.  Media reports and Former Michael Dunn stated at City of Lakeland Commission Meeting that the Public is voting

with their wallets.   Donations are not coming in because Lakelanders do not want the Memorial Cenotaph removed from Munn Park.

50. On June 8, 2018, City Manager Tony Delgado submitted an "Application for Certification of Review" to the City's Historic Preservation Board, who is entrusted with Preservation of the Munn Park Historic District.   The Application cites the projection for consideration to be a 'Relocation'.   This is misleading to the Historic Preservation Board. On July 26, 2018, the Historic Preservation Board voted to approve the permit.

**51.** On or about October, 21 2018, Michael Dunn, outspoken Commissioner for preserving the Munn Park Cenotaph, resigned from office due an unfortunate incident at his retail store, believed to be unrelated to the Cenotaph.   To fill the vacancy on an interim basis, Mayor Mutz recruited former Commissioner Don Selvege.   Selvege was approved by the Commissioners on October 26, 2018 and was sworn in the following week.   Selvege had on numerous occasions showed his bias against and disdain for the Memorial publically likening it to a 'Monument to Hitler", but on other occasions, wistfully likening it to himself as a 'young man doing his duty'.

52. At, arguably, the first opportunity to do so after he was Sworn in, looking for a way to pay for and to expedite the Memorial's removal from the Park, at a non-noticed meeting with no opportunity for citizen input, Commissioners Selvege, Walker and Troller and Mayor Mutz voted to disregard their May 7th Commission decision regarding Private Donations and to proceed with using the City's Red light Camera funds to take down the Munn Park Cenotaph.   At the Commission's next public meeting, Citizens voiced their anger and outrage at the subterfuge and challenged the legality of the process.   Finally at

the end of the discussion, the City Attorney conceded, that decision should come as an agenda item at a properly-noticed City Commission Meeting.

53. The November 19, 2018 City of Lakeland Commission Meeting includes Agenda item VII A (Finance Director:  Appropriation and Increase in Estimated Revenues from Red Light Camera Surplus).  The City's web site advertises that the purpose of the Red Light Camera Program 'is it to increase overall traffic safety in the City of Lakeland", but if used to move the Munn Park Memorial is diverting funds from traffic safety to other purposes.  If adopted at the November 19, 2018 meeting, public funds will be diverted from the City's stated purpose of the Rd Light Camera Program.

## ALLEGATIONS REGARDING 1ST AMENDEMENT ABUSES

54. Through the City's granting of permission to the UDC to install the Cenotaph in its Public Square, the City agreed to communicate political speech in perpetuity.  The UDC and UCV relied on the agreement and commitment by the City of Lakeland.  Now, however, the Mayor and City Council have breached the City's promise to communicate minority political speech.

55. Mary Joyce Stevens, a plaintiff here, a former member of the Lakeland Chapter of the Children of the Confederacy, is a descendant of a former president of the UDC and is also  a descendant of one honored by the Historic Cenotaph.  The City's action is denying her the benefit as well as all other like-minded American citizens who wish to publically honor their family members in a Memorial Cenotaph and express their free speech, from a Southern perspective about their family's history who served the Confederacy during the war of 1861-1865.

56. The Judah P. Benjamin Camp 2210, Sons of Confederate Veterans, plaintiffs here, is an organization of lineal descendants of Confederate Veterans which was 'presented the Cenotaph" by the UDC, and the successor organization to the United Confederate Veterans.  The Camp's membership includes descendants who live in the City of Lakeland whose forebearers are honored by the Historic Cenotaph.  The City's action is denying them the benefit of expressing their free speech, from a Southern perspective about their family's history who served for the Confederacy during the war of 1861-1865.

57. In addition, the City's decision to take down the Cenotaph and its inscriptions abridge the Plaintiffs' political speech.  The Historic Cenotaph has been in place for 108 years in a site created for free speech 'Public Square' venue.  A state actor cannot prohibit political speech in a public forum under its control. *Texas v. Johnson*, 491 U.S. 397, 397–98, 109 S. Ct. 2533 (1989).  Further, a state actor cannot proscribe nor prescribe the meaning of political symbols in a public forum. *Id*. at 415.  "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.  *Johnson*, 491 U.S. at 415.

Further, the City's plan to remove the Cenotaph with its inscriptions establishes a constitutional injury, because some Plaintiffs are descendants of the American veterans that the statues commemorate and whose memory, acts, and political philosophy Plaintiffs or Plaintiffs' forebears have protected since the placement of the Cenotaph in the 1910. The Free Speech Clause of the U.S. Constitution applies to private speech that takes place on government property. "Where the government seeks to restrict [private]

speech by restricting access to its own property, the level of scrutiny to which the restriction is subjected depends on how the property is categorized as a forum for speech." *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 800, 105 S.Ct. 3439 (1985). Government property can be categorized as a traditional public forum (a space like the public square, "immemorially ... held in trust for the use of the public"), a designated public forum (purposefully opened by the government as a forum for public expression) or a non-public forum. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 469–70, 129 S.Ct. 1125 (2009); *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 679 n. 11, 130 S.Ct. 2971 (2010). There is no question that the UDC intended the Cenotaph to honor the memory of those who died in service of the Confederacy during the War Between the states, not limited to those from the area, but also those families relocated to it and sought to honor those whose grave site was in a far-away state, or known only to God.  The Cenotaph clearly reflected expressions of public mourning, honor and respect for dead veterans on public property.

The fact that what is now construed to be political speech is memorialized in monuments and statues does not take away from its value.  The City approved of the method and manner of the UDC's and SCV's and its members and other plaintiff's private speech on Southern history when it accepted and agreed to the installation of the Cenotaph.  As a public park, created to be the historic Public Square, there is no place that freedom of speech should be more valued and protected.  The City allowed and, in fact, supported placement of the Cenotaph with full knowledge it was to be a permanent installation. The cenotaph also has the status of public art.

58. Further, the City's plan to remove the Cenotaph with its inscriptions establishes a constitutional injury, because some Plaintiffs are descendants of the American veterans that the statues commemorate and whose memory, acts, and political philosophy Plaintiffs or Plaintiffs' forebears have protected since the placement of the Cenotaph in the 1910. The Free Speech Clause of the U.S. Constitution applies to private speech that takes place on government property. "Where the government seeks to restrict [private] speech by restricting access to its own property, the level of scrutiny to which the restriction is subjected depends on how the property is categorized as a forum for speech." *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 800, 105 S.Ct. 3439 (1985). Government property can be categorized as a traditional public forum (a space like the public square, "immemorially ... held in trust for the use of the public"), a designated public forum (purposefully opened by the government as a forum for public expression) or a non-public forum. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 469–70, 129 S.Ct. 1125 (2009); *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 679 n. 11, 130 S.Ct. 2971 (2010). There is no question that the UDC intended the Cenotaph to honor the memory of those who died in service of the Confederacy during the War Between the states, not limited to those from the area, but also those families relocated to it and sought to honor those whose grave site was in a far-away state, or known only to God.  The Cenotaph clearly reflected expressions of public mourning, honor and respect for dead veterans on public property.

The fact that what is now construed to be political speech is memorialized in monuments and statues does not take away from its value.  The City approved of the method and manner of the UDC's and SCV's and its members and other plaintiff's private speech on

Southern history when it accepted and agreed to the installation of the Cenotaph.  As a public park, created to be the historic Public Square, there is no place that freedom of speech should be more valued and protected.  The City allowed and, in fact, supported placement of the Cenotaph with full knowledge it was to be a permanent installation. The cenotaph also has the status of public art.

59. Now, the City should not be allowed to silence the political speech because Southern history has become unpopular with a vocal minority.   In fact, Mr. Munn wanted Munn Park for the very purpose of ensuring that Lakelanders had an outdoor forum for free speech.  The City's planned removal of the Cenotaph and its inscriptions will eradicate the political speech Mr. Munn sought and that was utilized by the UDC and authorized by Lakeland's City fathers.  The City is now seeking to suppress that speech because it now finds it unpopular or controversial.

**ALLEGATIONS REGARDING SOLICITATION OF PRIVATE DONATIONS**

60. On May 7, 2018, at its regular meeting, the Lakeland City Commission voted to move its historic War Memorial Cenotaph from Munn Park to Veterans Park provided Private Donations would pay the "full costs".  As of July 26, 2018, less than $15,000 of the estimated $250,000 needed to complete the project had been raised.

61. Mayor Mutz prepared and mailed a fundraising letter asking for donations.  The letter was printed on City of Lakeland Stationary it was mailed in the US Mail with postage paid for by the City of Lakeland, and it was no doubt printed on city printers, and letters were most likely signed, folded, and envelopes addressed and letters inserted by city staff, all using City of Lakeland resources and funds, not Private Donations.

62. A Response from the City of Lakeland to Florida Public Records Request (F.S. 119) stated that no public funds were used for this letter.  However, Mr. Mutz stated in a City Public Meeting on Thursday, July 26, 2018 that several hundred letters were mailed.

63. This mailing by Mayor Mutz and the City of Lakeland was in direct violation of the Commission's official Action on May 7, 2018, if not the letter of the Action, certainly the intent of the Action, and therein constitutes Mis-appropriation of taxpayer funds and a breach of trust of his official duties.

## COUNTS

### COUNT 1 – VIOLATION OF CONSTITUTIONAL RIGHTS
### UNDER 42 U.S.C. § 1983

64. The City's decision to take down the Cenotaph including its inscriptions and bas-relief art (poetic and visual) constitutes a violation of United States Constitution actionable under 42 U.S.C. § 1983.  Specifically, the City's decision to remove the Cenotaph was done under the color of law as an official action of the City, a state entity (as a chartered municipality), and deprived Plaintiffs of rights, privileges or immunities secured by the federal Constitution and laws.  Mayor Mutz has abridged Plaintiffs' right to free speech and equal protection by deciding to remove the Cenotaph which communicated minority political speech in a public forum. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S. Ct. 2286 (1972).

65. The government does not have a free hand to regulate private speech on government property. Courts long ago recognized that members of the public retain strong free speech rights when they venture into public streets and parks, "which 'have immemorially been

held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948 (1983).   The open areas of a Public Square are either traditional or limited public fora.   The decision to remove the statues is not necessary to serve a compelling state interest nor was the decision to do so narrowly drawn to achieve a compelling state interest. Further, the decision to remove the Cenotaph was not content-neutral or reasonable in light of the City's Diversity policy and Historical Protection policy and Tourism promotion mission.   The City agreed to communicate the UDC's 1910 political and religious speech and freedom of expression through art (figurative and poetic) and now should be enjoined from removing or obscuring the object that communicates this assemblages of liberties, i.e. the Munn Park Cenotaph and their inscriptions and artwork.

66. Plaintiffs also seek their reasonable attorney and expert's fees as part of their costs in bringing their 42 U.S.C. §1983 claim against Mayor Mutz pursuant to 42 U.S. C. §1988.

67. This case is distinguishable from *Summum & Walker* for the following reasons:  1. The Suumam Case related to a new park under development in which all monuments would be perceived as reflecting the current governmental speech.   Whereas, in this case, the century-old speech has been in situ for 108 years; and 2.  The facts of the Sumam Case related to a religious monument that appeared to have breached the Establishment Clause of the U.S. Constitution, whereas the Munn Park Monument was not erected by any religions organization nor favored any particular religion.

68. Additionally, the "Endorsement Test" set out in *Lynch v. Donnelly, 465 U.S. 668 (1984)* is an example of a violation of the First Amendment to the Constitution.  By removing the historic Cenotaph, the City is clearly disapproving of the memorial message, which is an integral part of the Cenotaph's message, and that of the plaintiffs.

69. Removal of the Cenotaph is an injury to Compelled and Symbolic speech.  As evidenced in *United States v. O'Brien, Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 622, 114 S. CT 2445, 129 L. Ed 2d497 (1994)*   cited in *Foley v. Orange County,* the City's action is profoundly not content neutral, and in fact, through their actions compelling the public to express beliefs that they do not hold by publically, emphatically stifling one point of view.  But for the political motives and views of the Defendants, and the complaints about the content, there would be no reason to believe that the City would have acted at all.  Additionally, the UDC and its members, and the SCV as successor the UCV, as patron for the artist who devised the art including the sculpture, bas-relief art and the poem, free speech rights are being infringed by the removal of the Cenotaph from the Public Square. In *Desmond v. Harris (No. 1:16-cv-01206-DAD-BAM)* an artist sued the State of California over its expulsion of his painting that included a Confederate Flag from public display.  The State acquiesced and settled the case and allowed display of the art.

## COUNT 2 - BREACH OF BAILMENT AGREEMENT

70. When the City approved the plans for the Cenotaph, and the UDC fulfilled the plans, a bailment agreement was created with an expectation of permanency.  Neither entity has lapsed, and without the novation of both parties, the bailment agreement extends into perpetuity.  The UDC has neither asked for the Cenotaph to be returned, nor waived its

interest in having the Cenotaph remain in place.   Arbitrary and unilateral action by the City is a breach of the Bailment Agreement.

## COUNT 3 – VIOLATION OF PUBLIC TRUST

71. When the City breached the Bailment Agreement with the UDC, it abridged the public's ability to publicly mourn, pay respects to, memorialize and community the Southern point of view about the war and the sacrifice of American veterans, including those who served for the Confederacy during the War.   This Violation affects the plaintiff, Mary Stevens, and others like her, as descendants and family members of "Our Confederate Dead" inscribed on the Cenotaph, as well as all persons who were intended to benefit from the Agreement, including Steven Gardner, the inchoate Veterans Monuments Association of America, Inc., as well as all other like-minded Florida and American citizens who wish to honor history from a Southern perspective as well as American veterans.   As a taxpaying resident of the City of Lakeland, plaintiff Gardner and is particularly sensitive to this issue.

72. When Mayor Mutz and the City of Lakeland used Public Funds to solicit Private Donations for removal of the Memorial, they violated their Official Action on May 7, 2018 which required only Private Funds to pay for the "full costs" of the removal. Plaintiffs Steven Gardner and Randy Whittiker as taxpaying residents of the City of Lakeland, are particularly sensitive to this issue.

73. When Mayor Mutz, Commissioners Troller, Walter and Selvege voted to allocate Red-Light Camera Funds to pay to remove the Munn Park Memorial Cenotaph in a non-noticed meeting, they signaled their willingness to disregard the City's stated public

purpose of the Red Light Camera Program, i.e. 'to increase overall traffic safety in the City of Lakeland", and do diverting funds from traffic safety to other purposes.  If adopted at the November 19, 2018 meeting, public funds will be diverted from the City's stated purpose of the program of 'traffic safety'.  Plaintiff Steven Gardner as taxpaying residents of the City of Lakeland, is particularly sensitive to this issue.

74. By falsifying the Permit Application to the Historic Preservation Board, by misusing Public Funds to generate Private Donations in circumvention of official Action of the Commission, by failing to accurately respond to the Public Records Request regarding mailing of Mayor Mutz' donation solicitation letter and by the surreptitious encroachment on the City's Red Light Camera Funds for removal of the Cenotaph, the City of Lakeland, Manager Delgado, Mayor Mutz  have exhibited a pattern of disregarding the public's wishes and mis-representing and failure to make necessary disclosures to the public.

## COUNT 4 – BREACH OF DUE PROCESS
## UNDER 28 U.S. C. 2201

75. The City is obligated to provide Plantiffs and other like-minded Florida and American citizens due process, including reasonable notice, an opportunity to be heard and a hearing before a neutral arbiter, before removing the Historic Munn Park Cenotaph.  In this case, due process additionally includes review by the Historic Preservation Board, This declaration is sought pursuant to 28 U.S. C. 2201.   Plaintiffs also seek attorney's fees and costs in conjunction with their declaratory judgment claim.

## COUNT 5 – VIOLATION OF LAKELAND'S HISTORIC PRESERVATION ORDINANCE

76. In deciding to remove the Munn Park Cenotaph, the City of Lakeland knowingly and intentionally violated its own Land Development Code  Article 11:  Historic Preservation Standards.   The City Manager's application to the Historic Preservation Board for a 'relocation' of the Cenotaph suggests that it will be relocated somewhere else in the District, but that is not the case and is in the best case confusing, and in the worst case, fraudulent in that the City Commission voted to relocate it to a modern park outside of the Historic District, therein Removing or "Demolishing" it from the District.  Article 11 of the City's Land Use Code states "Demolition is generally discouraged and shall be reviewed with regards to three factors:   1.  Architectural significance, based on documentation of the property's architectural integrity and historical or cultural significance;  2.  Contribution of the building or structure to the history or origins of the historic district;  3.  The future utilization of the site, including any replacement buildings or structures.  Since the Historic Munn Park Cenotaph is the one of the oldest structures in the oldest Historic District in Lakeland, and is the only 'contributing object', its contribution to and historical and cultural significance to the District is not only self-evident but is documented in the Application to the State of Florida for the Munn Park Historic District.  When the Munn Park Historic District Nomination was approved by the State of Florida, the Cenotaph was added to the State of Florida Department of State's Historic Site Master File, and was thus acknowledged by all parties as a significant Florida Historic Site.  No future use for the site of the Cenotaph has was presented to the Board.

Additionally, Manager Delgado knowingly and intentionally violated the City Code by submitting an misleading Application.

Plaintiffs have been injured by City who arbitrarily and unilaterally eradicated the assemblage of Constitutional liberties that has been enjoyed in Historic District since 1910, that the Defendant have sworn to protect.

### COUNT 6 – INTENT AND COLLUSION TO VIOLATE FLORIDA STATUTES XLVI: 872.02

**77.** Defendants William Mutz, Tony Delago, Don Selvege, Justin Troller, Phillip Walker, Jim Malless, Antonio A.  Padilla colluded with intent to violate Florida Statue 872.02(1)(a) and commit a felony of the third degree by voting to remove, proposing to remove, estimating costs to remove **a structure designed as a Memorial for the dead. Injunctive relief is sought to prevent perpetration of a crime against a Memorial to the Dead.**

### COUNT 7 – VIOLATION OF FLORIDA STATUTES 267.013

78. Defendant Secretary Detzner violated **Florida Statue 267.013** (Division of Historical Resources; powers and duties) when he neglected to fulfill his duty to take such actions necessary to protect and preserve a Historic Resource in Lakeland, a subdivision of the State of Florida.  Secretary Detzner cannot arbitrarily choose parts of the Florida Statutes to which he chooses to comply.  This is a clear violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution.  The Munn Park Historic Cenotaph, as a Contributing Object to the Munn Park National Register Historic District, as certified by the State of Florida is self-evident to be a Historic Resource protected by the Secretary of State.  The Defendant is neglecting his affirmative duty to the detriment

of the citizens of Florida whose precious, perishable Historic Resources are being

diminished under his administration, such duty to be exercised without regard to political

influence or content expression.

### REQUEST FOR INJUNCTIVE RELIEF THROUGH TEMPORARY RESTRAINING ORDER AND DECLATORY JUDGMENT

79. An Affidavit that proves the allegations in the application for injunctive relief and

Temporary Restraining Order are attached and incorporated by reference.

80. **Plaintiffs will likely suffer imminent irreparable injury**, if Mayor Mutz, Antonio A.

Padillo and Administrator Delgado are not restrained from removing the Cenotaph. Of

the 4 other circa 1900 Cenotaphs that have been taken down in Florida, half were

irreparably damaged during the process.  Fed. R. Civ. P. 65(b)(1); *Winter v. Natural*

*Resources Defense Council, Inc*., 555 U.S. 7, 22, 129 S. Ct. 365 (2008).  Mayor Mutz

public stated that the Cenotaph will come down and the Plaintiffs believe that the City

will act immediately to take down the Cenotaph to American veterans and disavow the

sacrifices of their families and extinguish the assemblage of Constitutional Liberties the

Cenotaph represents without notice, because of his previous statements and the pattern of

conduct established in other Florida communities.  Plaintiff's note:  The same contractor

has been engaged without full bid process as was engaged in an adjacent County for the

same purpose.  Fed. R. Civ. P. 65(b)(1); *Winter,* 555 U.S. at 22.  "The loss of First

Amendment interests were either threatened or in fact are being impaired at the time

relief was sought.  The loss of First Amendment freedoms, for even minimal periods of

time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373,

96 S. Ct. 2673 (1976).

81. Mayor Mutz is a state actor who is ordaining the political meaning of political, religious and artistic expression in a public forum.  This government determination of expression in a public forum without a showing of any compelling interest in making the determination and without due process and without an independent arbiter is a continuing irreparable harm, as contemplated under *Texas v. Johnson* and *Elrod v. Burns.*

82. There is no adequate remedy at law, because any legal remedy would be merely illusory. *Northern Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 105 S. Ct. 459 (1984).  The denial of free speech and due process on a continuing basis cannot be readily reduced to monetary damages.  The only adequate remedy to the abridgment of free speech is the injunctive demand to resume the abridged assemblage of Constitutional liberties and to provide the denied due process.

83. There is a substantial likelihood that the plaintiffs will prevail on the merits.  *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S. Ct. 2561 (1975).  Defendants have expressly abridged the aforementioned assemblage of Constitutional represented represented by the Cenotaph and attempted to substitute a new interpretation of the Cenotaph's meaning. Case law on this issue clearly shows that government actors may not enforce their own interpretation of political messages on political symbols.  *Johnson*, 491 U.S. at 415. Plaintiffs are confident that the Court will agree that the Defendants are abridging the long-standing tradition of freedom of expression in a public forum, which should be remedied by the Court's authority.

84. The on-going harm to Plaintiffs outweighs the harm that a temporary restraining order would inflict on the City of Lakeland  *Winter*, 555 U.S. at 24; *Yakus v. United States*, 321 U.S. 414, 440, 64 S. Ct. 660 (1944).  Plaintiffs are already experiencing continuing harm

by the decision to deny freedom of expression communicated by the Cenotaph and its inscriptions in bas-relief. *Elrod*, 427 U.S. at 373. Mayor Mutz and the other Defendants will suffer no harm by allowing the Cenotaph to stay in place.

85. Issuance of a temporary restraining order would not adversely affect the public interest and public policy, because issuance of the order would serve the public interest. *See Winter*, 555 U.S. at 24-26. Indeed, the benefit to third parties would be enormous, as the display of the direct, factual inscriptions on the plinths, such as "Our Confederate Dead" would allow everyone in this public forum in the Public Square to appreciate that historic facts pose no actual harm. Indeed, the order would mark the end of the Orwellian terror that Mayor Mutz is attempting to inflict on the public and the plaintiffs.

Plaintiffs are willing to post a bond in the amount the Court deems appropriate. However, Plaintiffs are filing this cause in the public interest and request that the Court order no or a nominal bond. *Kaepa, Inc., v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). Firstly, neither the City of Lakeland nor any Defendant stands in financial risk by the issuance of the requested injunction. Secondly, Plaintiffs are suing in the public interest and stand to recover no damages in this action, or other compensation other than attorneys fees and costs under 42 U.S.C. §1988, 28 U.S.C. §2201.

86. The Court should enter this temporary restraining order without notice to Mayor Mutz because Plaintiffs will likely suffer immediate and irreparable injury, loss, or damage if the order is not granted before this Action can be heard and there is no less drastic way to protect plaintiffs' interests. Fed. R. Civ. P. 65(b)(1); *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 106 (2d Cir. 2009); *see also Benchbook for U.S. District Court Judges,* at 239. The course of dealing in Florida has often been to remove public Memorials without

notice and under cover of darkness.  Plaintiffs have reason to believe that Mayor Mutz will once again, following these precedents, surreptitiously remove the Cenotaph without notice in the dead of night.  Plaintiffs believe that were the Mayor to receive notice that this Court was contemplating an injunction to protect the Cenotaph, the Mayor would accelerate the removal of the Cenotaph.

**87.** Plaintiffs ask the Court to set the request for Injunctive Relief in the form of a **Temporary Restraining Order, followed by Preliminary Injunction Hearing at the EARLIEST POSSIBLE TIME.**

## J.  CONCLUSION

88.  Plaintiffs have proper jurisdiction and venue to appear before the Court and request injunctive relief.  The defendants are in imminent danger of irreparable infringement of their 1st Amendments rights.  The City has breached their bailment agreement with the UDC, violated its trust with the Citizens of Lakeland, violated its own ordinances and trampled on the assemblage of well-recognized Constitutional liberties enjoyed by the citizenry through the Historic Munn Park Cenotaph. The Plaintiffs are particularly sensitive to the issues raised in this Complaint and uniquely suitable as plaintiffs due to their connections, agreements, missions and lineage.

 In addition, Secretary Ditzner has violated State Law by neglecting to protect the Historical Resource owned by the citizens of Florida.

Finally, the Defendents, Padillo, Delgado Mayor Mutz and others seem to be in a conspiracy to violate Florida State Law that prevents altering a Memorial site.

This Federal Court has the proper jurisdiction to discipline an officer of the State of Florida and require him to do his duty, and it is the Federal Court which has the highest duty to protect the assemblage of Constitutional liberties affected by the removal of the Historic Munn Park Cenotaph.

Plaintiffs are concerned that the Defendants will move swiftly and unilaterally to eradicate freedom of expression and the plaintiffs will suffer irreparable harm by the removal of the Munn Park Cenotaph if injunctive relief through a Temporary Restraining Order is not issued immediately.

For these reasons, Plaintiffs ask the Court to issue an emergency Temporary Restraining Order preventing Defendants the City of Lakeland, or its agents, including Energy Services Corp. from removing any or all of the Historic Munn Park Cenotaph or obscuring or infringing it in any way.

## K.  PRAYER

89. For these reasons, Plaintiffs ask that the Court do the following:

    a.   Order that the City not take down the Munn Park Historic Cenotaph;

    b.   Order that City does not infringe on the inscriptions or symbolism etched into the Historic Munn Park Cenotaph in any way;

    c.   Enter judgment for Plaintiffs;

d.  Award costs of suit to Plaintiffs; and

e.  Award attorney and expert's fees pursuant to 42 U.S.C. §1988, 28 U.S.C. §2201.

f.  Plaintiffs further ask the Court for any and all relief to which Plaintiffs may show they are entitled.

Respectfully submitted,

By: _David R. Mc Callister_____

  DAVID RHODES MCCALLISTER,
  Trial Counsel, for all Plaintiffs
  Florida Bar No. 724637
  E-mail davidmccallister@hotmail.com
  Tel. (813) 973-4319
  Fax (352) 260-0157

STATE OF FLORIDA

PASCO COUNTY

## AFFIDAVIT OF DAVID RHODES MCCALLISTER

Before me, the undersigned notary, on this day personally appeared David Rhodes McCallister affiant, a person whose identity is known to me.   After I administered an oath, affiant testified as follows:

1.      "My name is David Rhodes McCallister.  I am competent to make this affidavit. The facts stated in the First Amended Original Complaint & Application for Temporary Restraining Order are within my personal knowledge and are true and correct.

2.      I have been reading news articles, talking with witnesses, and reading statements made by the parties in this matter."

DAVID R. MCCALLISTER

SWORN TO and SUBSCRIBED before me by David Rhodes McCallister on November 19, 2018.

BRANDIE K HUNTER
MY COMMISSION # GG 090189
EXPIRES: June 6, 2021
Bonded Thru Budget Notary Services

Notary Public in and for
The State of Florida